UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROL A. MCCLURE,

                              Case No. No. 17-11027

              Plaintiff,              District Judge Sean F. Cox

v.                                Magistrate Judge R. Steven Whalen

COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.

_____/

**REPORT AND RECOMMENDATION**

Plaintiff Carol A. McClure ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.  The parties have filed cross-motions for summary judgment which have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  For the reasons set forth below, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #21] and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #17].

**I.   PROCEDURAL HISTORY**

On December 10, 2013, Plaintiff filed an application for DIB, alleging disability as of August 1, 2013 (Tr. 147).  Upon initial denial of the claim, Plaintiff requested an administrative hearing, held on September 30, 2015 in Mount Pleasant, Michigan (Tr. 31).

-1-

Administrative Law Judge ("ALJ") Laura Chess presided.  Plaintiff, represented by attorney Randall Manseur, testified, as did Vocational Expert ("VE") Toni McFarlane (Tr. 38-63, 63-73).   On November 27, 2015, ALJ Chess determined that Plaintiff was capable of a significant range of unskilled, exertionally sedentary work (Tr. 13-26).   On February 7, 2017, the Appeals Council declined to review the administrative decision (Tr. 1-4).  Plaintiff filed suit in this Court on March 31, 2017.

## II.  BACKGROUND FACTS

Plaintiff, born January 2, 1967, was 48 at the time of the administrative decision (Tr. 26, 147).   She completed 7th grade and worked previously as a care giver at a home for the mentally handicapped, private care worker, and cashier (Tr. 168).   She alleges disability resulting from an enlarged heart valve, lung problems, depression, and anxiety (Tr. 166).

### A.  Plaintiff's Testimony

Plaintiff offered the following testimony:

She worked from January, 2007 to January, 2008 as a cashier (Tr. 38).  She worked between 15 and 36 hours a week (Tr. 38).  She stood 5' 1" and weighed 214 pounds (Tr. 39). She recently lost weight due to loss of appetite resulting from depression (Tr. 40).  She experienced leg soreness due to obesity (Tr. 41).  She had recently cut back her cigarette use to less than a half pack a day (Tr. 42).  She had been advised that smoking affected the conditions of Chronic Obstructive Pulmonary Disease ("COPD") and chronic bronchitis (Tr. 42).  She experienced problems with smoking cessation despite the use of nicotine patches

-2-

(Tr. 42).    Plaintiff watched television but was unable to follow the storylines due to both concentrational problems and the inability to sit for extended periods (Tr. 43).   She had three dogs but had not walked them lately (Tr. 44).   She rarely cooked and on those occasions, made simple meals such as grilled cheese and tomato soup (Tr. 44).   Until around one year before the hearing, she regularly had acquaintances in for coffee but lately, felt "clos[ed] in" by the presence of others (Tr. 45).   She shopped as required but did "not like to deal with people" and became "hateful and mean" if an issue arose with the cashier (Tr. 45).   She would be capable of buying stamps at the post office so long as there were not a lot of people around (Tr. 46).   She disliked being touched by even immediate family members (Tr. 46).

Plaintiff's symptoms of acid reflux were managed by medicine and drinking milk (Tr. 46).   She took medication for hypertension but when her blood pressure was elevated (due to anxiety) she experienced headaches and flushing (Tr. 47).   She took medication for anxiety and also used three separate inhalers for respiratory problems (Tr. 47).   She typically used an inhaler after smoking cigarettes (Tr. 63).   Before ceasing work in August, 2013, she worked as a care giver for mentally handicapped adults (Tr. 48).   She  quit after becoming overwhelmed with the increasing job responsibilities (Tr. 48).   Before quitting, she experienced two to three panic attacks on each shift, each requiring 10 to 15-minute breaks (Tr. 49).   Her employers were aware of her panic attacks and allowed her to take breaks (Tr. 50).   She looked unsuccessfully for work since quitting the care-giving position (Tr. 50).   At no point did she contact vocational rehabilitation services (Tr. 62).   Later, as symptoms of

anxiety increased, she declined to look for work due to her aversion to being around others (Tr. 51).

Although she was currently unemployed, she experienced two or three panic attacks each week (Tr. 51).  The panic attacks were characterized by shortness of breath, aversion to light, and crying (Tr. 51).  She had thoughts about hurting herself but at those times called a crisis hotline (Tr. 52).  She had called the hotline two or three times in the past year (Tr. 52).  *Plaintiff's counsel requested that the record reflect that since the start of the hearing, Plaintiff had been "rocking back and forth"* (Tr. 52).

Plaintiff then resumed her testimony:

In terms of concentrational problems, Plaintiff experienced a slowed response time to questions (Tr. 53).

*At the request of Plaintiff, the ALJ then took a short recess* (Tr. 53).

Plaintiff then resumed her testimony:

Her concentrational problems were characterized by her inability to remember telephone numbers (Tr. 54).  She and her husband shopped at night when fewer people were in the store (Tr. 54).  She held a valid driver's license but did not like to go out without her husband (Tr. 54).  Her driving alone was limited to trips to the pharmacy, short grocery shopping trips, or making the 12-mile drive to her daughter's house (Tr. 55).

-4-

In the three months before the hearing, Plaintiff developed foot pain (Tr. 56). She was unable to sit or stand for more than 20 minutes at a time (Tr. 56). Due to leg pain and hip numbness, she was unable to walk for more than 60 steps without requiring a break (Tr. 57). She stayed inside during humid weather due to breathing problems (Tr. 57). She experienced night-time sleep disturbances as a result of racing thoughts (Tr. 58). She was able to to perform kitchen and household chores for around 10 minutes before requiring a break due to leg pain and breathing problems (Tr. 58). She was unable to lift her 30-pound grandson (Tr. 60).

On a typical day Plaintiff made coffee, sat down, used a computer tablet, turned on the television to watch the news, and did dishes before going back to bed until noon (Tr. 60). She then swept the floors, did other household chores, and did a load of laundry (Tr. 61). She spent the rest of the day playing games on her tablet or staring out the kitchen window (Tr. 61). She let her dogs out periodically (Tr. 61).

**B. Medical Records**

**1. Records Related to Plaintiff's Treatment[1]**

In January, 2013, Plaintiff was advised to cut back on her tobacco use (Tr. 255). February, 2013 treating records note Plaintiff's report that a baby shower she hosted for her daughter was marred by an uninvited guest (Tr. 255). Plaintiff denied suicidal thoughts or

---

[1]Records predating the August 1, 2013 alleged onset of disability are included for background purposes only.

ideation (Tr. 255). She refused recommendations for psychological counseling (Tr. 255). June, 2013 records note a history of moderate COPD (Tr. 252).

November, 2013 records note Plaintiff's report of increasing anxiety and depression with "a couple fleeting moments" of suicidal thoughts but no plans and no current ideation (Tr. 249). Plaintiff reported a difficult relationship with her daughter and that her own mother died earlier in the year (Tr. 249). She denied recent panic attacks (Tr. 249). She was referred for psychological counseling (Tr. 248).

A January, 2014 psychological intake assessment by Gary K. Ralph, D.O. noted Plaintiff's report of "bad dreams" and "a hard time" since her mother passed away (Tr. 271). She admitted to suicidal ideation but was deterred by thoughts of her eight-month-old grandson (Tr. 271). Dr. Ralph noted signs of moderate depression but full orientation (Tr. 272). Plaintiff exhibited mild memory loss and a short attention span (Tr. 272). Dr. Ralph diagnosed Plaintiff with depression, a generalized anxiety disorder, and caffeine intoxication, assigning her a GAF of 55[2] (Tr. 272-273). He advised Plaintiff to cut back on her use of caffeine (Tr. 273). He found that memory problems were "likely" related to poor sleep hygiene (Tr. 273). Counseling notes from later the same month note a slight improvement, in psychological symptoms but continued situational stressors (Tr. 274). She reported a modest improvement in mood the following month (Tr. 297).

---

[2]

A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Diagnostic and Statistical Manual of Mental Disorders—Text Revision* ("*DSM–IV–TR*"), 34.

March, 2014 counseling records note an improvement in mood after a reduction in caffeine intake (Tr. 299).  Plaintiff exhibited a normal thought process (Tr. 299).  Notes by a physical treatment provider from the same month note her report of bilateral leg pain while lying down or sitting for extended periods (Tr. 392-394).  The following month, she denied suicidal thoughts (Tr. 303).  She denied medication side effects (Tr. 303).  In May, 2014, Plaintiff brought her infant grandson to a counseling session (Tr. 307). Plaintiff reported racing thoughts and leg pain but said that she was otherwise "okay" (Tr. 307).  In June, 2014, Plaintiff reported stress due to altercations with both her children (Tr. 311).  Treating records note that she was pleasant and cooperative (Tr. 311).  July, counseling records note that recent cardiac testing was negative (Tr. 315, 423-424, 535).  The following month, Harold B. Lenhart, M.D. noted reports of continued depression and sleeping problems (Tr. 319).  A chest x-ray from the same month was unremarkable (Tr. 415).

October, 2014 records note an improvement in Plaintiff's psychological condition (Tr. 323).  The same month, she reported recent headaches, an intermittent cough, but no wheezing (Tr. 390).  In December, 2014, Plaintiff denied medication side effects (Tr. 327).  She reported that she worked as a care giver until "a patient she was close with passed away" and that she "had some disagreements with" the group home managers at her place of work (Tr. 351).  She reported that she and her husband had three dogs, a fish, and a lizard (Tr. 351).  She reported that she was "currently busy preparing for Christmas" and spent her time baking, decorating, listening to music, and watching television when not experiencing

bouts of depression (Tr. 356).  She reported that she depended on her friends for support (Tr. 356).

In January, 2015, Plaintiff reported intermittent depression (Tr. 331).  She exhibited normal speech and a normal gait (Tr. 331).  A colonoscopy from the same month was unremarkable (Tr. 475).   The next month, Plaintiff reported that Cymbalta was "partially helpful" (Tr. 335).  March, 2015 records note no swelling of the lower extremities (Tr. 377).  May, 2015 records note that Plaintiff experienced increased "crying spells" after undergoing a hysterectomy several weeks earlier (Tr. 339).  Plaintiff exhibited a normal mood without suicidal or homicidal ideation (Tr. 339).   June, 2015 physical treatment records note Plaintiff's complaints of neuropathy of the lower extremities (Tr. 363).   August, 2015 treating records note shortness of breath and moderate COPD (Tr. 371).  Plaintiff admitted that she continued to smoke daily (Tr. 371).  A chest x-ray was unremarkable (Tr. 492, 565).  In October, 2015, Plaintiff's treating physician signed an application for a disability parking placard, noting the conditions of shortness of breath, asthma, and tobacco dependence (Tr. 566).

## 2.  Non-Treating Records

In March, 2014, Bruce G. Douglass, Ph.D. performed a non-examining assessment of the treating and consultative records on behalf of the SSA, finding that Plaintiff experienced mild limitation in activities of daily living and moderate limitation in social functioning and in concentration, persistence, or pace (Tr. 81, 84-85).  He noted that while

Plaintiff alleged disability due primarily to breathing problems, the psychological treating records made no reference to respiratory problems (Tr. 82). He concluded that Plaintiff was capable of performing "routine, two-step tasks on a sustained basis" (Tr. 85).

The same month, A. Neil Johnson, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of breathing difficulties, hypertension, obesity, anxiety, and depression (Tr. 281). Plaintiff reported that she saw a counselor every two weeks but was making little progress (Tr. 281). Plaintiff admitted to smoking a half pack of cigarettes daily (Tr. 282). Dr. Johnson noted a slightly flat affect but otherwise appropriate behavior (Tr. 383). Pulmonary testing showed moderate restriction and "mild" obstruction (Tr. 285).

The following month, Robert Nelson, M.D. performed a non-examining assessment of Plaintiff's physical conditions, finding that she could lift 20 pounds occasionally and 10 frequently; sit, stand, or walk for six hours in an eight-hour workday; and push and pull without limitation (Tr. 82-84). He found that Plaintiff did not experience postural, manipulative, visual, or communicative limitations but found that she should avoid concentrated exposure to airborne hazards (Tr. 83).

## C. Vocational Testimony

VE Manseur found that Plaintiff's past relevant work as a care giver (nurse assistant) was semiskilled and generally performed at the exertionally medium level (exertionally heavy as actually performed)[3] (Tr. 235).

ALJ Chess posed the following set of limitations to the VE, describing a hypothetical individual of Plaintiff's age, educational level, and past relevant work:

> [S]uch an individual hypothetical worker could lift and/or carry 20 pounds occasionally and 10 pounds frequently. Could stand and/or walk for six hours in an eight-hour workday and sit for six hours in an eight-hour workday, with normal breaks. The individual could tolerate only occasional exposure to dust, fumes, odors, gases and other pulmonary irritants. The individual could tolerate only occasional exposure to extreme heat or humidity in the work setting. The individual could have no work at unprotected heights or in the vicinity of unprotected, dangerous machinery. The individual could have no work with the public, but could tolerate occasional interaction with coworkers, and the individual would be limited to routine two-step tasks. Would such an individual be able to perform the claimant's past work, either as the claimant performed . . . or as that work is generally performed in the national economy? (Tr. 66).

---

[3]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

The VE testified that while the individual would be unable to perform Plaintiff's past relevant work, she could perform the light, unskilled work of an inspector/hand packager (113,000 positions in the national economy); garment sorter (112,000); and marker (140,000) (Tr. 66). The VE testified that if the above described individual were further limited to standing/walking for *four* (rather than six) hours each day and was precluded from "production rate or pace work, such as work on an assembly line, and would be limited to simple tasks" with "only occasional decision-making or changes in the work setting," she could still perform the jobs of inspector/hand packager and garment sorter (Tr. 68).

The VE found that if the same individual described in the original hypothetical question were limited to standing/walking for four hours over an eight-hour period and lifting 10 pounds occasionally and less than 10 pounds frequently, she could work as a document preparer (68,000); final assembler (30,000); and table worker (11,000) (Tr. 70). The VE stated that the inclusion of a preclusion on "production rate or pace work, such as work on an assembly line, and would be limited to simple tasks" with decision-making on an occasional basis, the sedentary job findings would remain the same (Tr. 72). The VE stated that his testimony was consistent with the information found in the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 72). The VE testified that the need to miss two or more days of work each month, or to take 60-minute breaks each day outside of scheduled work breaks, all competitive work would be precluded (Tr. 72-73).

### D.   The ALJ's Determination

Citing the medical transcript, ALJ Chess found that Plaintiff experienced the severe impairments of "[COPD], chronic bronchitis, iron deficiency anemia, obesity, hypertension, idiopathic peripheral neuropathy of the bilateral lower extremities, gastroesophageal reflux disease, major depressive disorder, and generalized anxiety disorder" but that none of the conditions met or equaled a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15-17).  She found that the conditions of abdominal and pelvic pain, fecal incontinence, possible syncopal episode, hypopotassemia, and caffeine intoxication were non-severe (Tr. 15-16).  She found that the conditions of posttraumatic stress disorder and borderline personality disorder were "non-medically determinable impairments" because neither of the conditions had been established by "signs, symptoms, [or] laboratory findings" (Tr. 16).  She found that Plaintiff experienced mild restriction in activities of daily living and moderate restriction in social functioning and concentration, persistence, or pace (Tr. 18). ALJ Chess determined that Plaintiff had an RFC for sedentary work with the following additional restrictions:

> [She] is able to lift, carry, push, or pull ten pounds occasionally, and lighter weights, such as file folders and hand tools frequently; she can stand and/or walk for four hours in an eight-hour workday and sit for six hours in an eight-hour workday; she can tolerate occasional exposure to dust, fumes, odors, gases, and other pulmonary irritants, and tolerate occasional exposure to extreme heat or humidity in the work setting; she can perform no work at unprotected heights or in the vicinity of unprotected dangerous machinery; she can perform no work with the general public, but can tolerate occasional interaction with co-workers; she can perform routine two-step tasks; and she is limited to occasional decision-making or changes in the work setting  (Tr.

19).

Citing the VE's testimony, the ALJ determined that Plaintiff could perform the sedentary work of a document preparer, final assembler, and inspector/table worker (Tr. 25, 70).

The ALJ partially accepted Plaintiff's allegations of limitation, noting that her allegations of physical and mental limitation were undermined by "several 'no shows'" where Plaintiff did not provide an explanation for failing to keep a doctor's appointment (Tr. 22). She noted that the psychological treating records showed generally mild symptoms (Tr. 23). She noted that Plaintiff was able to perform household chores on an ongoing basis (Tr. 23). The ALJ cited psychological treating records showing that Plaintiff's anxiety improved with medication and that the mental health treatment had been exclusively conservative (Tr. 23). The ALJ noted that while Plaintiff "rocked during the hearing" and required a short break, the "stress-induced behavior coincide[d] with [her] testimony that stress in her last job overwhelmed her . . ." (Tr. 23). The ALJ accorded "some weight" to Plaintiff's cousin's observation that Plaintiff was able to shop for food weekly, could prepare simple meals, pay attention for thirty minutes, but did not handle "stress or changes well" (Tr. 24 *citing* Tr. 175-182). The ALJ stated that she accounted for Plaintiff's stress by limiting her to only "occasional decision-making or changes in the work setting" (Tr. 23).

### III.    STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985).  Substantial evidence is more than a scintilla but less than a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)).  The standard of review is deferential and  "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

### IV.    FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

-14-

to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

Plaintiff's one argument for remand pertains to the ALJ's findings regarding her psychological limitations.  Citing her testimony and the psychological treating records, she disputes the ALJ's conclusion that she is mentally capable of unskilled work. *Plaintiff's Brief,* 10-13, *Docket #17,* Pg ID 621.  She contends that she is psychologically unable to perform all of the "basic work-related activities on a sustained basis" as defined SSR 96-9p. *Id.* at 11-12 (*citing* 1996 WL 374185, at *9 (July 2, 1982)).

SSR 96-9p, ("*Implications of a Residual Functional Capacity for less than a Full Range of Sedentary Work*") governs the effect of physical and mental limitations on the sedentary work base.   Under SSR 96-9p the mental activities generally required by

-15-

competitive, remunerative, unskilled work are "understanding, remembering, and carrying out simple instructions;" "making judgments that are commensurate with the functions of unskilled work- - *i.e.*, simple work- related decisions;" "responding appropriately to supervision, co- workers and usual work situations;" and, "dealing with changes in a routine work setting." *Id.* at *9.

Substantial evidence supports the ALJ's finding that Plaintiff is psychologically capable of "basic work-related activities." As an initial matter, Dr. Douglass' non-examining finding that Plaintiff did not have significant limitations in the ability to understand, remember, and carry out simple instructions; make simple work-related decisions; or, experience significant limitations in adaptive activities supports the ALJ's finding that Plaintiff was psychologically capable of a range of sedentary, unskilled work (Tr. 23, 85).

While Dr. Douglass found *moderate* limitation in the ability to interact with others, moderate difficulties in social functioning are not fatal to the finding that Plaintiff could perform a range of unskilled sedentary work (Tr. 85). The moderate limitation was accounted for by the hypothetical restriction presented to the VE ("no work with the public," and only "occasional interaction with coworkers") and the identical RFC found in the administrative decision (Tr. 19, 23, 66). The VE's finding that a preclusion on work with the public and only occasional interaction with coworkers would nonetheless allow for a significant range of unskilled, sedentary work constitutes substantial evidence in support of the ALJ's Step Five determination. *See Schaefer v. Commissioner of Social Sec.*, 2014 WL 562436, at *2

(E.D.Mich. February 13, 2014)(Berg, J.)(hypothetical restrictions of "no more than occasional interaction with the public or co-workers" adequately addresses moderate limitation in social functioning)(internal citations omitted).

Plaintiff's argument that the hearing testimony and medical evidence reflect a greater degree of psychological limitation is not well taken.  Plaintiff points out that her anxiety was "so overwhelming in the hearing" that she rocked throughout the hearing and required a break in the middle of hearing to compose herself.  *Plaintiff's Brief* at 12.  However, the ALJ addressed Plaintiff's signs of anxiety during the hearing but noted that "the hearing was an atypical, stressful event . . ." (Tr. 23).  The ALJ noted that the limitations in concentration and social functioning set forth in the RFC adequately accounted for symptoms of anxiety (Tr. 23).  While Plaintiff argues that she had symptoms of borderline personality disorder and Post Traumatic Stress Disorder ("PTSD"), *Plaintiff's Brief* at 12, the transcript page cited (reflecting her early stages of psychological treatment) states only that the two conditions should be "ruled out" (Tr. 301).  The subsequent records do not indicate that she was diagnosed with either condition.  While one entry states that Plaintiff's hygiene was "marginal," (Tr. 315), the bulk of the records show either good hygiene (Tr. 319) or make no reference to her appearance.

Plaintiff cites her own testimony that she quit her job as a care giver "because it became too overwhelming." *Plaintiff's Brief* at 13 (*citing* Tr. 48).  However, the ALJ acknowledged Plaintiff's testimony regarding the former work, noting that the RFC limited

Plaintiff to "only occasional decision-making or changes in the work setting" (Tr. 19, 23). It is worth noting that Plaintiff's testimony that she quit work after becoming psychologically overwhelmed differs somewhat from her December, 2014 report to a treating source that she quit work after "a patient she was close with passed away" and due to "disagreements" her employers (Tr. 351). Likewise, her testimony that she was unable to cope with visits from friends (Tr. 45) stands at odds as of September, 2015 stands at odds with her December, 2014 report that she relied on her friends for support (Tr. 356). While Plaintiff testified that her aversion to social visits began in the year before the hearing, the psychological records for that period do not show a deterioration in her psychological condition (Tr. 331, 339).

In closing, I note that my recommendation to uphold the administrative findings should not be interpreted to wholly discount Plaintiff's claims of psychological limitations. However, because the ALJ's determination is supported by substantial evidence and is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, it should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## VI.  CONCLUSION

For these reasons, I recommend that Defendant's Motion for Summary Judgment be GRANTED [Docket #21] and that Plaintiff's Motion for Summary Judgment be DENIED [Docket #17].

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than 20 pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: June 13, 2018            s/R. Steven Whalen                           
                                R. STEVEN WHALEN
                                UNITED STATES MAGISTRATE JUDGE

Case 2:17-cv-11027-SFC-RSW   ECF No. 22, PageID.660   Filed 06/13/18   Page 20 of 20

**CERTIFICATE OF SERVICE**

I hereby certify on June 13, 2018 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically. I hereby certify that a copy of this paper was mailed to non-registered ECF participants on June 13, 2018.

s/Carolyn M. Ciesla
Case Manager for the
Honorable R. Steven Whalen

-20-